UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

CIVIL ACTION NO. 14-22-DLB-HAI

YULUNDA KAREN MCALISTER                                                    PLAINTIFF


vs.                          <u>MEMORANDUM OPINION AND ORDER</u>


LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON                                                          DEFENDANT

****    ****    ****    ****

Plaintiff Yulunda McAlister brings this action against Defendant Liberty Life Assurance Company of Boston pursuant to the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1132. The parties have filed cross-motions for judgment on the record that are fully briefed and ripe for review. (Docs. 15, 16, 18, 19). McAlister argues that her benefits should not have been terminated because her mental impairment has an organic cause, as opposed to a psychiatric or psychological one. Because McAlister has not shown that Liberty's decision to terminate her long term disability benefits was arbitrary and capricious, the Court will enter judgment for Liberty.

## I. FACTUAL AND PROCEDURAL BACKGROUND

McAlister was employed as a claims manager with Allstate Insurance Company. (Doc. 16 at 2). As part of her employment, she enrolled in short term disability (STD) and long term disability (LTD) insurance coverage. (*Id.*). Defendant Liberty is the claim administrator for those plans. (Docs. 16 at 2; 18 at 4). The LTD policy, which is at issue

1

in this case, defines "disability" in the following manner:

> i.      [D]uring the Elimination period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of h[er] Own Occupation; and
> ii.      thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation

(AR 7).

Relevant here, the policy has a two-year limitation on benefits related to a Mental Illness diability.  (AR at 21).  "Mental Illness" is defined as "a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness."  (AR 9).

In April 2010, McAlister applied for STD.  (AR 1060).  In order to evaluate McAlister's claim, Liberty requested her medical records.  (1022).  McAlister's treating psychiatrist, Dr. Angela Burt, submitted treatment notes from May 20, 2010, wherein she opined that McAlister had "[s]erious cognitive [symptoms] of depression."  (AR 1018).  She also completed a June 21, 2010 Restrictions Form that stated McAlister was "currently suicidal" and "depressed."  (AR 1021).  Jessie Singleton, a social worker at Gulf Oaks Psychiatric Services, also submitted treated notes dated May 7, 2010, that indicated McAlister was having "depressive episodes," "thoughts of suicide," and "extreme outbursts of anger."  (AR 1004).  Liberty approved McAlister for STD through August 12, 2010, and for LTD beginning on August 13, 2010.  (AR 990).  In a letter confirming its approval of LTD benefits, Liberty advised McAlister that the benefits were "payable up to a maximum of 24 months, or August 11, 2012 . . . ."  (AR 983).

2

After approving McAlister for disability benefits, Liberty continued to receive updated medical information. In March 2011, Dr. Burt reported that McAlister's diagnosis remained Major Depression, Borderline Personality Disorder, and Obsessive Compulsive Personality Disorder. (AR 817). Dr. Burt further noted that McAlister's symptoms included "rage episodes" and "suicidal indeation," and that she could not "tolerate stress, frustration, [or] pressure of any kind." (*Id.*).

Liberty also requested a peer review from Dr. Gregory Barclay, Board Certified in Psychiatry. In a July 5, 2011 report, he opined that the medical evidence did not support McAlister's current impairment. (AR 700-02). Specifically, he noted that there was a "lack of objective evidence of cognitive impairment" and that he could not "consider [McAlister's] self-report as a reliable measurement of impairment due to evidence in the records that she has been dishonest and minimized problems, suggesting she is also prone to symptom exaggeration . . . ." (*Id.*).

Based in part on Dr. Barclay's report, Liberty denied McAlister's claim for benefits effective July 27, 2011. (AR 667-69). McAlister appealed, and in support submitted additional medical records from Neurologist Dr. Abha Mishra. Those records contain results from a December 2011 EEG and MRI Without Contrast. The EEG results were "[a]bnormal . . . due to intermittent left frontotemporal spike and wave discharges suggestive of epileptiform dicharges." (AR 429). Meanwhile, the MRI stated that McAlister had "[s]mall asymmetric focus of abnormal signal at the left parietal white matter on the T2-weighted images potentially representing some mild chronic small vessel ischemic changes or possibly some gcoliosis." (AR 167). Dr. Mirsha suspected that McAlister had vascular dementia. (AR 433).

3

Liberty then requested and received peer review reports in March 2012 from Drs. Michael A. Rater and Joshua A. Alpers, both Board Certified in Psychiatry. Dr. Rater opined that McAlister would be a "danger to herself and others in the workplace because of her reactivity and composure." (AR 400). He also stated that she "would experience problems with cognition when her emotional condition was exacerbated." (*Id.*). Dr. Alpers indicated that McAlister's symptoms included "headaches, cervical radiculopathy, and possible epilepsy." (AR 402). He also stated that "though diagnosed with 'vascular dementia' by Dr. Mishra, this diagnosis is not supported given the lack of vascular disease on MRI of the brain." (AR 403). After reviewing these reports, Liberty decided to reinstate McAlister's LTD benefits. (AR 394).

On July 26, 2012, Liberty informed McAlister that due to the 24-month Mental Illness limitation, her LTD benefits would expire on August 12, 2012. (AR 201). Liberty also advised McAlister that "to remain eligible for benefits . . . which are not related to a Mental Illness, [she] must be physically disabled from Any Occupation." (AR 202). McAlister appealed her benefit denial on January 22, 2013. (AR 189). McAlister did not initially provide medical records in support of her appeal, although she did request a 30-day extension to submit additional evidence. (*Id.*).

In September 2013, McAlister (through counsel) sent Liberty a letter that contained updated medical records. In the letter, McAlister argued that "although [she has] significant psychological problems, she also has cognitive problems of an organic etiology which would independently prevent her from performing the material and substantial duties of any occupation." (AR 114). The updated medical records were from Dr. Mirsha and Dr. Melissa Aubert, a Licensed Clinical Neuropsychologist. In an October 30, 2013 letter,

4

Liberty informed McAlister that it would review her appeal.  (AR 112).

Dr. Mirsha's updated medical records included a February 2012 follow-up EEG and a January 2012 follow-up MRI.  The second EEG was "within normal limits," while the repeat MRI states that there was "no abnormal enhancement identified."  (AR 158, 167). Dr. Aubert's August 2013 evaluation contained a diagnosis of a "cognitive disorder, not otherwise specified" that created "significant impairments."  (AR 178, 181).  Based on this diagnosis, Dr. Aubert opined that "it is highly unlikely that Ms. McAlister would be able to maintain gainful employment."  (AR 181).  Dr. Aubert could not "determine the precise etiology of Ms. McAlister's obvious cognitive decline," but did note that "Ms. McAlister is known to have several conditions that [may] have a negative impact in the brain, including uncontrolled diabetes, hypertension, and hypercholesterolemia."  (AR 181).  She further found that McAlister's "[a]ffected brain areas are the bilateral frontal lobes, left temporal areas, and right temporal and parietal areas."  (Ar 180-81).  Finally, Dr. Aubert diagnosed McAlister with "ongoing emotional difficulties, including severe depression . . . ."  (AR 181).

After receiving McAlister's letter, Liberty referred her claim to Dr. David Alter, Board Certified in Psychology.  (AR 94).  In a January 7, 2014 report, Dr. Alter agreed that there was evidence of cognitive impairment (AR 103-05), but concluded that "progressive organic diseases affecting [McAlister's] brain is not supported by the data."  (AR 103).  Instead, he found that "it [was] reasonable to conclude that the identified difficulties stem from the exacerbation of [McAlister's] longstanding psychiatric disturbances."  (AR 106).  Dr. Alter further determined that the evaluation results did not support vascular dementia.  (AR 104). Liberty received an additional Peer Review Report from Dr. Ekokobe Fonkem, Board Certified in Neurology, wherein he opined that McAlister had "sustained capacity for full-

time work within the supported restrictions stated above." (AR 92).

On January 14, 2014, Liberty sent McAlister a letter informing her that it was denying her appeal based on the 24-month Mental Illness limitation, as well as its determination that she was not disabled from her own occupation. (AR 81). The decision to deny benefits was based on a "thorough review," which included Drs. Alter's and Fonkem's reports as well as a statement from Dr. Mishra indicating that McAlister did not have any physical restrictions or limitations. (AR 78, 81, 245).

## II.  STANDARD OF REVIEW

A district court reviews a plan administrator's denial of ERISA benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1063-64 (6th Cir. 2014) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When a plan gives discretion to the plan administrator, a court reviews the benefits denial under an arbitrary and capricious standard. *Id.* Here, both parties agree that the plan in question affords the administrator discretion, so the arbitrary and capricious standard applies. (Docs. 16 at 10; 18 at 21; AR at 36).

Although the arbitrary and capricious standard is "not without some teeth," it is still an "extremely deferential" standard of review. *McClain*, 740 F.3d at 1054. Under this standard, an administrator's decision "must be upheld if it results from a deliberate principled reasoning process and is supported by 'substantial evidence.'" *Id.* (citations omitted). So long as it is "possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's*

6

*Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir.1989)). In reviewing a benefits denial, a court considers only that evidence available to the administrator at the time the final decision was made. *McClain*, 740 F.3d at 1054.

Finally, the Court will take into account the conflict of interest that arises from Liberty being both the payor of the benefits and the decisionmaker. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). However, that inherent conflict does not change the standard of review, and McAlister submitted no evidence on the issue. *See id.* at 293 n. 2 ("The Court would have a better feel for the weight to accord this conflict of interest if [the plaintiff] had explored the issue through discovery.").

### III.  ANALYSIS

McAlister argues that the 24-month Mental Illness limitation that Liberty relied on to terminate her benefits does not apply to a Mental Illness stemming from an organic cause. (Doc. 16 at 12). In support, she cites previous ERISA litigation involving Liberty and notes that the policy defines Mental Illness as a "psychiatric or psychological condition." (Doc. 16 at 12-16). The Court will assume, without deciding, that the Mental Illness limitation does not apply to a condition with an organic cause. That is of no consequence, however, because substantial evidence supports Liberty's conclusion that McAlister's Mental Illness stemmed from a psychiatric or psychological condition . (AR 78 "[T]he medical records did not provide current treatment to support a physical impairment . . . .").

First, Dr. Alter conducted a January 2014 Peer review in which he determined that "progressive organic diseases affecting [McAlister's] brain is not supported by the data." (AR 103). Dr. Alter also opined that McAlister's "cognitive decline is likely multi-faceted

. . . ."  (AR 103, 106).  McAlister suggests that these statements are ambiguous, and standing alone, they may be.  (Doc. 16 at 201-21).  However, any ambiguity is cleared up by Dr. Alter's specific finding that McAlister's "identified difficulties stem from the exacerbation of [her] longstanding *psychiatric* disturbances."  (AR 106) (emphasis added).  Dr. Alter's opinion alone provides substantial evidence to support Liberty's decision that McAlister was subject to the 24-month Mental Illness limitation.  *McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) ("Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.").

McAlister insists that the plan administrator was not permitted to rely on Dr. Alter's review because it is conclusory.  But that ignores the fact that Dr. Alter issued his opinion after examining all the medical evidence in the record, including both sets of EEG and MRI results and Dr. Aubert's report.  (AR 94-100).  After reviewing this evidence, Dr. Alter found that the "data" did not support progressive organic disease, but rather stemmed from "psychiatric disturbances."  (AR 103, 106).  Liberty did not abuse its discretion in choosing to rely on Dr. Alter's file review to terminate McAlister's benefits.  *See Calvert*, 409 F.3d at 295 (stating that "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly").

Second, Dr. Burt's May 20, 2010 treatment notes stated that McAlister had "[s]erious cognitive [symptoms] *of depression*."  (AR 1018) (emphasis added).  Depression connotes a psychological cause, not an organic one.  *Fischer v. Liberty Life Assur. Co. of Boston*,

8

576 F.3d 369, 376 (7th Cir. 2009) (stating that "depression [is] a psychological disease, not an organic disease"). McAlister attacks Dr. Burt's opinion as outdated. However, McAlister provided Liberty with updated medical records from Dr. Burt through November 2011 (AR 78), Dr. Burt was McAlister's original treating psychiatrist (AR 1021), and Dr. Burt was the first doctor to diagnose McAlister with a cognitive disorder (AR 1018). If anything, it would have been arbitrary and capricious for Liberty to ignore Dr. Burt's opinion.

Third, although Dr. Mishra initially suspected that McAlister suffered from vascular dementia after reviewing abnormal EEG and MRI results from December 2011, she later conducted a follow-up EEG in February 2012 that was "within normal limits," as well as a follow-up MRI in January 2012 that showed "no abnormal enhancement." (AR 158, 167). Dr. Mishra's notes from McAlister's subsequent office visits in May and August 2012 make no mention of vascular dementia, but do mention the psychiatric conditions of depression and anxiety. (AR 146, 148). Moreover, Dr. Mirsha's prior diagnosis of dementia is refuted by Dr. Alpher's March 2012 review, which was based on the updated EEG and MRI results, and wherein he states that "Dr. Mishra's [diagnosis of vascular dementia] is not supported given the lack of vascular disease on MRI of the brain." (AR 403). Dr. Alter likewise determined that there was no evidence indicating McAlister suffered from vascular dementia. (AR 104).

McAlister relies heavily on Dr. Aubert's August 2013 evaluation, which contained a diagnosis of a "cognitive disorder, not otherwise specified" that created "significant impairments." (AR 178). Dr. Aubert also opined that "it is highly unlikely that Ms. McAlister would be able to maintain gainful employment." (AR 178, 181). McAlister, however, puts

too much weight on Dr. Aubert's report, especially since she could not "determine the precise etiology of Ms. McAlister's obvious cognitive decline." (AR 181).  Instead, Dr. Aubert made the unremarkable finding that "Ms. McAlister is known to have several conditions that [*may*][1] have a negative impact in the brain, including uncontrolled diabetes, hypertension, and hypercholesterolemia." (AR 181).  Dr. Aubert confirmed that she could not determine the genesis of McAlister's Mental Illness when she stated that "*[r]egardless of the medical cause*, Ms. McAlister is experiencing significant impairments in many areas of cognitive functioning." (AR 181) (emphasis added).

Additionally, while Dr. Aubert reviewed McAlister's abnormal EEG and MRI results, her report suggests that she *did not* review McAlister's followup EEG and MRI, which revealed no abnormalities. (*See* AR 173).  Indeed, Dr. Aubert's review makes no mention of these test results.  McAlister does not attempt to explain why she did not provide Dr. Aubert with these follow-up tests, despite Dr. Aubert's suggestion that she would like to review the repeat MRI. (*See* AR 181).  McAlister praises Dr. Aubert's conclusion as "correlated . . . to findings on brain MRI and EEG." (Doc. 16 at 20).  However, Dr. Aubert apparently relied on cherry-picked test results as opposed to conducting a complete review of the record.  Dr. Aubert's failure to review McAlister's follow-up EEG and MRI provided Liberty with a sufficient reason to reject her opinion.

Next, McAlister cites to the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition-Text Revision in insisting that Dr. Aubert's diagnosis of a "cognitive disorder, not otherwise specified" necessarily "entails an organic, rather than psychological,

---

1)  The report actually reads "my have," but the Court is confident that is a typo and Dr. Aubert meant "may have."

condition." (Doc. 16 at 16). However, even if this is accepted as true, it does not permit reversal. Although this evidence supports McAlister's argument that her mental condition has an organic cause, there is also conflicting and substantial evidence that suggests her mental disability has a psychiatric cause. Liberty was permitted to reject McAlister's evidence in favor of this contrary evidence; therefore, the Court must uphold Liberty's decision to deny benefits. *See Fischer*, 576 F.3d at 376 (upholding Liberty's denial of benefits under the 24-month Mental Illness limitation despite "ample evidence that [the claimant's] illness was in significant part organic" because the record also contained "reputable evidence that the sole cause of [the claimant's] disability . . . was depression, a psychological disease").

Finally, McAlister contends that Liberty did not properly consider or address whether her condition is organic or psychological, and that therefore it did not fulfill its duty to investigate. (Doc. 16 at 19). However, that assertion is completely contradicted by the record. In order to evaluate McAlister's appeal, Liberty obtained a psychological review from Dr. Alter and a physical review from Dr. Fonkem. (AR 79-80). Prior to that, it gathered peer review reports from Drs. Barclay (AR 700), Rater (AR 400), and Alphers (AR 402). Liberty then conducted a through review of those records. (AR 81). Liberty did not expressly state that McAlister did not suffer from an organic-based condition. However, it inherently and necessarily made that finding by concluding that there was no "proof of impairment from a physical component" and that McAlister was subject to the 24-month limitation. (AR 81). Because Liberty's ultimate decision to deny benefits is supported by substantial evidence, the Court grants Liberty's motion for judgment on the record. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) ("[T]he

11

ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious.").

Additionally, the Court notes that McAlister makes no attempt to argue that Liberty was arbitrary and capricious in determining that she was not physically disabled from performing any occupation.  Pursuant to the LTD plan's terms, a covered person is disabled after 24 months only if he or she cannot perform the Material and Substantial Duties of Any Occupation.  (AR 7).  Dr. Fonkem opined in January 2014 that McAlister had "sustained capacity for full-time work within the supported restrictions above."  (AR 92).  Additionally, Dr. Mishra determined in June 2012 that McAlister had "no physical restrictions."  (AR 245). These expert opinions constitute substantial evidence supporting Liberty's conclusion that McAlister was not physically impaired from performing even her own occupation, and therefore was not entitled to benefits after August 12, 2012.

## IV.  CONCLUSION

Accordingly, for the reasons stated herein, **IT IS HEREBY ORDERED** that:

(1)    Plaintiff's Motion for Judgment on the ERISA Record (Doc. 15) is **denied**;

(2)    Defendant's Motion for Judgment on the ERISA Record (Doc. 18) is **granted**;

(2)    Plaintiff's claims are **dismissed with prejudice**; and

(3)    A **Judgment** will be entered concurrently herewith.

This 27th day of July, 2015.



Signed By:

*David L. Bunning*

**United States District Judge**

\\156.125.121.215\bunning$\DATA\Opinions\London\14-cv-22 McAlister MOO.wpd